## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JENNIFER S. KING,

        *Plaintiff*,

    v.

ANTONY BLINKEN,

        *Defendant*.

Civil Action No. 23-1386 (LLA)

## MEMORANDUM OPINION

Proceeding pro se, Plaintiff Jennifer S. King brings this action against Defendant Antony Blinken in his official capacity as Secretary of State, alleging that the State Department discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Pending before the court is the Secretary's motion to dismiss or, in the alternative, for summary judgment. ECF No. 10. For the reasons explained below, the court will grant the Secretary's motion and dismiss the case.

### I.    Factual Background

In considering the Secretary's motion to dismiss, the court will assume that the facts alleged in Ms. King's complaint are true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Because Ms. King is proceeding pro se, the court will construe her pleadings liberally. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed' . . . and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976))). The court will also take judicial notice of documents from the administrative proceedings that were attached to the complaint and briefing, *Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 366 n.2

(D.D.C. 2018) (explaining that "[i]n employment discrimination cases, courts often take judicial notice of [Equal Employment Opportunity Commission ("EEOC")] charges and EEOC decisions" in evaluating a motion to dismiss), and documents incorporated by reference into Ms. King's complaint, *see Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) ("A district court may consider a document that a complaint specifically references without converting the motion into one for summary judgment.").[1]

With these principles in mind, the facts are as follows: Ms. King, a Black-American woman, has worked at the State Department for over nineteen years. ECF No. 2 ¶¶ 8-9. In August 2019, she accepted a limited non-career foreign service position as a Public Affairs Officer, Supervisory Section Chief ("PAO") at the U.S. Embassy in Bujumbura, Burundi. *Id.* ¶ 10. The position was considered "Hard-to-Fill," and the appointment was for two years with the possibility of extensions. *Id.*; *see* ECF No. 2-1, at 1. While Ms. King had accepted the position in August 2019, she did not arrive in Burundi until November 2020. ECF No. 2 ¶¶ 10, 17.

As the PAO, Ms. King was responsible for writing the Embassy's Public Diplomacy Implementation Plan ("PDIP") for Fiscal Year 2021, managing programs such as the Young Africans Leadership Initiative and the Nelson Mandela Fellowship, and overseeing a budget for

---

[1] The court will thus take judicial notice of the portion of the EEOC's decision that Ms. King attached as Exhibit 1 to her amended complaint, ECF No. 2-1, and the State Department's internal Equal Employment Opportunity ("EEO") documents attached as Exhibits A and B to the Secretary's motion to dismiss, ECF No. 10-1 (Exs. A & B). The court will further consider Exhibits C and D to the Secretary's motion to dismiss, ECF No. 10-1 (Exs. C & D), as incorporated by reference into Ms. King's complaint because they are reproductions of emails that Ms. King discusses in her complaint. The court will not consider Exhibit E to the Secretary's motion to dismiss, ECF No. 10-1 (Ex. E) because it is a reproduction of an email exchange that Ms. King does not reference in her complaint.

small grants.  *Id.* ¶ 11.  Her supervisors were Acting Chargé des Affaires Stephanie Bunce and Acting Deputy Chief of Mission Timothy Sikes.  *Id.* ¶¶ 12-13.[2]

Before Ms. King's arrival at the Embassy, Ms. Bunce emailed Ms. King to request updates regarding the Public Affairs Section ("PAS").  *Id.* ¶ 15.  In August 2020, Ms. King spoke with Ms. Bunce to inform her that she had requested that the Embassy's PAS team be part of a pilot program for a new database called "Public Diplomacy Tools."  *Id.* ¶¶ 15-16.  When Ms. King subsequently arrived in Burundi in November 2020, Ms. Bunce told her that she was unaware of Ms. King's efforts related to the pilot program.  *Id.* ¶ 16.

The first draft of the FY2021 PDIP was due on November 13, 2020, and the final draft was due to the Public Diplomacy Bureau ("PDB") on November 30.  *Id.* ¶¶ 17-18.  Ms. King's arrival in Burundi was delayed from November 11 to November 18, but Tijen Ayabar, an officer in the PDB, told Ms. King that she could get an extension of the deadline for the draft PDIP.  *Id.* ¶ 17.

On November 16, Ms. Bunce told Ms. King that she had sent the draft PDIP to Ms. Ayabar on the date of the initial deadline, November 13.  *Id.* ¶ 18.  That same day, Ms. King requested that the PAS team send her the draft so that she could edit it while she was en route to Burundi.  *Id.*  Ms. King arrived in Burundi on November 18 and spent a week in quarantine.  *Id.* ¶ 19.

On November 23, Ms. King sent Ms. Bunce an executive summary for the Fiscal Year 2021 PDIP for her approval.  *Id.* ¶ 20.  The summary included language regarding the Black American Civil Rights Movement.  *Id.*  Ms. King claims that, rather than editing her executive summary, Ms. Bunce sent Mr. Sikes the PDIP for Fiscal Year 2020.  *Id.*  This raised "red flags" for Ms. King, because a white woman had written the PDIP for Fiscal Year 2020.  *Id.*

---

[2] The parties dispute who was Ms. King's first-line versus second-line supervisor, *compare* ECF No. 2 ¶ 13, *with* ECF No. 10, at 2 n. 1, but that has no bearing on the court's disposition of the Secretary's motion to dismiss.

The emails incorporated into the complaint confirm that Ms. King sent her version of the PDIP to Ms. Bunce and several others (whose names are redacted from the exhibit) on November 23. ECF No. 10-1, at 13-14. The following day, Mr. Sikes responded to introduce himself. *Id.* at 12-13. In that email, he stated, "As I'm sure you know, [illegible name] continued to move forward on the Public Affairs and Public Diplomacy requirements [s]ince our last PAO departed post. That included the submission of the PDIP prior to your arrival, as approved by DCM Bunce and Ambassador Reddick. I've attached that version here." *Id.* at 13. Ms. King responded that the submitted draft was "awful," and she requested clearance to use her version for the final submission on November 30. *Id.* at 12. Ms. King alleges that, on that same day, Mr. Sikes "verbally assaulted [her] in the office by saying 'I don't give a damn about the PDIP.'" ECF No. 2 ¶ 21.

On November 25, Ms. King emailed Mr. Sikes alleging that Ms. Bunce was discriminating against her. *Id.* ¶ 20. In the email, Ms. King wrote:

> Hi Tim,
>
> I'm trying really hard not to put you in the middle of this, because you don't know what is really going on. [Redacted] and [Ms. Bunce] both knew I was working on this PDIP and I have e-mails with [Ms. Bunce] to prove it. If my arrival hadn't been pushed back a week, I would have been able to submit the draft paper on time on November 13th. [Redacted] said I had an extension to submit the document. I submitted the document to the CDA [on] Monday for Clearance so that I may keep the timeline of submitting the final draft by November 30th. After six weeks of PD training, what further guidance do I need? I already explained the difficulty of why my language was not in PDtools. Was I supposed to stop my classes and my research to provide a play by play on what I was doing?
>
> I'm FEEELING [sic] that if I was a white woman I would not be treated this way. The document that is being reviewed is crap and last year's PDIP. The language in the document I wrote is the same language and written better than last year's PDIP. I could see if [Ms. Bunce] took the time to read it and at least write something

better than last year [but] I can't standby [sic] and let something like
that be submitted under the PAS.

Please note that an EO complaint is not about a person's INTENT it
is how it makes another person FEEL.  I just left an office where I
had to take 10 weeks off for mental health because of hidden racist
incidents like this from white women.  After George Floyd, I refuse
to let someone snuff the light out of my career.  I took this job to get
to SES.  Papers like this can make or break someone's career.  The
deadline to submit the final draft is November 30th and there is no
reasonable reason for it to be late.

Please note, I'm not being difficult.  If you read both papers you
would understand what I'm talking about[.]  Also, after 18 years of
service I don't have a problem bringing this to someone higher in
DC and letting them know the REAL reason the paper was not
submitted on time.

Like I said, I don't want to put you in the middle of whatever
[redacted] and [Ms. Bunce] got going on[.]  What you need to be
asking is why won't she clear the paper and what was the rush to
submit the paper behind my back, ok?  Why would she want to
submit a crappy paper written by a white woman, instead of reading
a perfectly good paper written by a Black woman?  Thank you for
your attention regarding this matter, Jennifer[.]

ECF No. 10-1, at 16-17; *see* ECF No. 2 ¶ 20.  Mr. Sikes responded by asking to have a "face to

face conversation about this."  ECF No. 10-1, at 16.  He also explained that "CDA Reddick [had]

made the decision to [s]ubmit the draft PDIP ba[s]ed on con[s]ultation with the team here, ju[s]t

prior to her departure," and he told Ms. King that, "[n]ow that you have arrived, we look forward

to your contributions to these discussions."  ECF No. 10-1, at 16.[3]

On November 28, Ms. King attended a fashion show with Tara Hazel, the wife of a Foreign

Service Officer in Burundi, at the Kiriri Garden Hotel.  ECF No. 2 ¶¶ 22, 43.  Neither Mr. Sikes

nor Ms. Bunce were at the fashion show.  *Id.* ¶ 45.  Ms. King recorded the fashion show on her

---

[3] Subsequent emails show that Ms. Bunce did engage with Ms. King's suggestions for the
final PDIP, *see* ECF No. 10-1, at 22 (Ex. E) (November 30 email from Ms. Bunce to Ms. King
stating that her ideas for the PDIP "had merit"), but, as explained, the court will not consider this
exhibit because it was not incorporated by reference into Ms. King's complaint.

personal phone, *id.* ¶ 22, and she "uttered several casual comments about the way the models[']
clothes and bodies looked, as she was recording," *id.* ¶ 39.

The day after the fashion show, Ms. Hazel asked Ms. King for her video recordings of the
show so that her daughter could use them for a school project. *Id.* ¶ 36. Ms. King warned
Ms. Hazel that the videos contained foul language, and Ms. Hazel "replied that her daughter had
been cursing since age two." *Id.* ¶ 37. Ms. King shared the videos with Ms. Hazel but asked that
Ms. Hazel's daughter edit out the swearing. *Id.* ¶ 38.

Through a process that allows family members of State Department employees to be hired,
Ms. Bunce hired Ms. Hazel to be her Office Management Assistant on December 7. *Id.* ¶ 43.
Ms. King alleges that Ms. Hazel "curse[d] frequently and casually" and even bragged about
cursing at medical staff. *Id.* ¶ 42. On November 16, before Ms. Bunce had hired Ms. Hazel, a
member of the Embassy's medical staff had reported Ms. Hazel to Mr. Sikes for using foul
language. *Id.* ¶¶ 42-43.

On December 1, Ms. King "requested permission to spread the word regarding the 65th
Anniversary of Rosa Parks and the Montgomery Bus boycott and virtual tour dates of the Rosa
Parks Museum in Montgomery, Alabama." *Id.* ¶ 24. In response to her request, "Mr. Sikes made
a racist, micro-aggressive remark regarding Rosa Parks." *Id.* Specifically, Mr. Sikes said, "the
people that work here at the Embassy are all elitist. Do you see the little buses they [local
Burundians] ride in? How can those people relate to a woman who couldn't get a seat on a bus?"
*Id.* (alteration in original). Ms. King alleges that Mr. Sikes was "[i]mplying that Burundians are
ignorant" and that he and Ms. Bunce "continuously blocked" her efforts "to raise awareness among
Burundians." *Id.*

On December 10, Ms. King met with Human Resources Management Officer Erin Butler, Ms. Bunce, and Mr. Sikes.  *Id.* ¶ 25.  These individuals "accused Plaintiff of inappropriate behavior" at the fashion show on November 28 and told her that "she was not suitable to represent the United States Embassy as a Public Affairs Officer."  *Id.*  Ms. King contends that she did not engage in any inappropriate behavior at the fashion show and that their accusation was "a pretext for discriminatory and retaliatory animus based on [her] race and her prior protected activities." *Id.* ¶ 26.

During the December 10 meeting, Ms. Bunce showed Ms. King a cable stating that there was video footage of her inappropriate behavior at the fashion show.  *Id*. ¶ 28.  Ms. King alleges that these videos "only showed [her] attending the fashion show and none of her cursing or portraying inappropriate behavior."  *Id.*  Ms. King appears to contend that Ms. Hazel shared Ms. King's personal video footage of the event with Embassy management, *id.* ¶¶ 44-46, but she asserts that Mr. Sikes made "no mention of Tara Hazel providing Plaintiff's own personal video recording" in an email summarizing the December 10 meeting, *id.* ¶ 44.

Ms. Butler, Ms. Bunce, and Mr. Sikes asked Ms. King to voluntarily curtail her assignment, told her that they would involuntarily curtail it if she did not voluntarily curtail it, and gave her ten days to leave the country.  *Id.* ¶ 25.  Ms. King initially agreed to voluntarily curtail her assignment because she "felt bullied," but she later changed her mind and requested an involuntary curtailment.  *Id*.  That same day, Embassy management curtailed Ms. King's assignment and directed her to leave her post.  *Id.* ¶ 14(a).

Ms. King returned to Washington, D.C. and accepted a position as a non-supervisory Foreign Affairs Officer with Conflict Stabilization Operations.  ECF No. 2-1, at 1.  She initiated an equal employment opportunity ("EEO") case based on her involuntary curtailment.  ECF No. 2

¶¶ 49-50.   In September 2021, Ms. King received a report of her EEO investigation, which included only her personal videos of the fashion show.  *Id.* ¶ 30.  Ms. King states that she "was never given an opportunity to review the videos or rebut the evidence upon which" her involuntary curtailment was based.  *Id.* ¶ 31.

Also in September 2021, Ms. King applied for Senior Executive Status ("SES"), but her application was denied due to a lack of experience.  ECF No. 2 ¶ 14(b).  She contends that she would have received the promotion to SES if she had obtained the necessary experience by completing her assignment in Burundi.  *Id.*

## II.   Procedural History

On December 14, 2020, Ms. King contacted the State Department's EEO counselor to lodge an informal complaint about her involuntary curtailment.  ECF No. 10-1, at 2; *see* 29 C.F.R. § 1614.105(a) (setting forth the process for an informal complaint).   On February 8, 2021, Ms. King filed a formal EEO complaint alleging employment discrimination based on race and reprisal.  ECF No. 2 ¶ 49; ECF No. 10-1, at 9-10; *see* 29 C.F.R. § 1614.106 (setting forth the process for a formal complaint).  The State Department issued a Final Agency Decision ("FAD") finding against Ms. King on November 19, 2021.  ECF No. 2 ¶ 51.  Ms. King appealed the FAD to the EEOC's Office of Federal Operations, *id.* ¶ 52, which affirmed on February 15, 2023, *id.* ¶ 53, ECF No. 2-1, at 1.  Ms. King sought reconsideration, ECF No. 2 ¶ 54, but the motion was rendered moot when she filed suit,  ECF No. 2 ¶ 55; *see* 29 C.F.R. § 1614.409 ("Filing a civil action . . . shall terminate Commission processing of the appeal.").

On May 16, 2023, Ms. King filed this action alleging discrimination on the basis of race and retaliation in violation of Title VII, ECF No. 1, and she later amended her complaint, ECF No. 2.  As relief, she seeks "lost wages and benefits from December 30, 2020"; "loss of equity for

condo sold before moving to Burundi"; that "[t]he cable, videos, and all correspondence regarding this case . . . be removed from all channels"; and "[n]on-pecuniary damages for deterioration of mental health and loss of enjoyment of life totaling $300,000."  ECF No. 2, at 10.

The Secretary has filed a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, a motion for summary judgment under Rule 56. ECF No. 10.  As is customary in cases with a pro se plaintiff, the court issued an order advising Ms. King of the legal rules that govern oppositions to such motions.  ECF No. 11; *see Fox v. Strickland*, 837 F.2d 507, 508 (D.C. Cir. 1988); *Neal v. Kelly*, 963 F.2d 453, 456-57 (D.C. Cir. 1992).  Ms. King filed an opposition, ECF No. 12, and the Secretary filed a reply, ECF No. 15. The motion is now ripe for consideration.

## II.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the plaintiff pleads facts that are more than "'merely consistent with' a defendant's liability" and that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 557); *see Banneker Ventures*, 798 F.3d at 1129 ("Plausibility requires 'more than a sheer possibility that a defendant has acted unlawfully.'" (quoting *Iqbal*, 556 U.S. at 678)).  "A complaint survives a motion to dismiss even '[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible.'"  *Banneker Ventures*, 798 F.3d at 1129 (alterations in original) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

When ruling on a motion to dismiss, the court may only consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (alteration in original) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)). The court "must treat the complaint's factual allegations as true . . . and must grant [the] plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). When the plaintiff is pro se, as Ms. King is here, the court will "liberally construe[]" her filings. *Erickson*, 551 U.S. at 94 (quoting *Estelle*, 429 U.S. at 106). The court, however, need not accept as true "a legal conclusion couched as a factual allegation" or an inference unsupported by facts set out in the complaint. *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).[4]

### III.    Discussion

The Secretary has moved to dismiss Ms. King's claims of retaliation and discrimination under Title VII for failure to state a claim under Rule 12(b)(6). The court agrees and will dismiss the case.

### A.    Retaliation Claim

Title VII prohibits an employer from discriminating against an employee because she "has opposed . . . an unlawful employment practice" or "has made a charge . . . or participated in any manner in an investigation" of discrimination. 42 U.S.C. § 2000e-3(a).[5] To survive a motion to

---

[4] Because the court is granting the Secretary's motion to dismiss, it need not describe the standard for granting summary judgment under Rule 56.

[5] Ms. King does not allege that she participated in any EEO investigation prior to her curtailment, so the court will analyze her complaint under Title VII's protection for opposing an unlawful employment practice.

dismiss, the plaintiff must plausibly allege that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action by her employer; and (3) a causal link connects the protected activity and the adverse action.  *See Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009); *Pierre v. Bennett*, 686 F. Supp. 3d 1, 9 (D.D.C. 2023).

The Secretary argues that Ms. King's retaliation claim should be dismissed because, in her amended complaint, Ms. King fails to allege either "a protected activity sufficient to invoke Title VII's anti-retaliation provision," ECF No. 10, at 4, or "a[] plausible causal link" between any protected activity and her curtailment, *id.* at 12.  Ms. King counters that she engaged in protected activity when she sent Mr. Sikes an email on November 25, 2020 accusing Ms. Bunce of discrimination for not editing her draft PDIP, ECF No. 12, at 4, and that she sufficiently alleges causation by virtue of the temporal proximity between her November 25 email and her December 10 curtailment, *id.* at 5-6.

The court concludes that Ms. King did not engage in protected activity under Title VII's antiretaliation provision.  *See* 42 U.S.C. § 2000e-3(a).  "Not every complaint garners its author protection under Title VII."  *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006).  "While no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition."  *Id.*  The "bare use" of a word like "discrimination" "is insufficient to create protected activity."  *Gibbs v. Wash. Metro. Area Transit Auth.*, 48 F. Supp. 3d 110, 133 n.8 (D.D.C. 2014).  Instead, the employee must "reasonably and in good faith believe[] [that the challenged practice] was unlawful under the statute."  *McGrath v. Clinton*, 666 F.3d 1377, 1381 (D.C. Cir. 2012) (emphasis omitted).

Ms. King's November 25, 2020 email to Mr. Sikes, in which Ms. King wrote, "I'm FEEELING [sic] that if I was a white woman I would not be treated this way," ECF No. 10-1,

at 17, was not protected activity. While Ms. King spoke in terms of disparate treatment, Ms. Bunce's "supposed failure" to review her draft PDIP, standing alone, "does not give rise to a reasonable inference that [Ms. Bunce] engaged in [race] discrimination." *Golden v. Mgmt. & Training Corp.*, 266 F. Supp. 3d 277, 284 (D.D.C. 2017).

*Golden* is nearly on all fours with the present case. There, the plaintiff had filed an internal grievance with his agency's EEO coordinator claiming that his employer's "failure to address his [various administrative] concerns . . . as well as his erroneous placement on a [Performance Improvement Plan] were the result of age discrimination and were characteristic of a hostile work environment." *Id.* (first and second alternations in original) (internal quotation marks omitted). The court concluded that his grievance was not protected activity because the plaintiff "had not offered any allegation that connect[ed] Defendants' failures to act with [his] age or otherwise demonstrated that they were motivated by discriminatory animus." *Id.* While the plaintiff had made the "bald assertion that Defendants did not address his concerns because of his age," that "'neither ma[de] the accusation true nor ma[de] it reasonable for him to have believed that it was true.'" *Id.* at 284-85 (quoting *McGrath*, 666 F.3d at 1381). As the court explained, "[i]f [the plaintiff's] internal charge about his various administrative concerns is to serve as the predicate for a retaliation claim, [the plaintiff] must allege some set of facts from which to infer that he *reasonably* believed Defendants' failure to act was a manifestation of age discrimination." *Id.* at 285.

As with the plaintiff in *Golden*, Ms. King has failed to allege any facts from which the court could draw a reasonable inference that she *reasonably* believed that Ms. Bunce's failure to review her draft PDIP was due to racial animus, so as to make her email to Mr. Sikes protected activity. For example, while Ms. King alleges that her draft report "contained language regarding

the Black American Civil Rights Movement," ECF No. 2 ¶ 20, her claim is premised on the allegation that Ms. Bunce did not read her report, *id.*  It defies reason that Ms. Bunce could have discriminated against Ms. King based on the contents of a report she had not read.  Ms. King's strongest factual allegation is that the previous PDIP had been written by a white woman.  *Id.*  But that assertion, without more, is simply insufficient to render her claim plausible, rather than merely possible.  *See Twombly*, 550 U.S. at 557 (explaining that the complaint's factual allegations must cross the line from possibility to plausibility).  The court therefore concludes that Ms. King's email to Mr. Sikes was not protected activity under Title VII and will dismiss her retaliation claim.[6]

### B.    Race Discrimination Claim

Title VII also makes it unlawful for an employer to discriminate against an individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  To state a claim for disparate treatment, the plaintiff must show that "(1) [s]he is a member of a protected class, (2) [s]he suffered an adverse employment action, and

---

[6] In her brief in opposition, Ms. King appears to suggest another potentially protected activity—that she "threatened to file an EEO complaint while [she and Embassy management] were discussing her assignment action/curtailment." ECF No. 12, at 4-5. Ms. King did not include this allegation in her amended complaint, but the court will consider it given her pro se status. *See Brown v. Whole Foods Market Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015) (explaining that a court must consider "a *pro se* litigant's complaint 'in light of' all filings" (quoting *Richardson v. United States*, 193 F.3d 545, 548 (D.C. Cir. 1999))).  Assuming for the sake of argument that threatening to file an EEO complaint is protected activity, Ms. King has failed to allege a causal connection between that activity and her curtailment because, by her own admission, she made this comment *after* Embassy management had already made the decision to curtail her assignment. *See* ECF No. 12, at 5.

Ms. King also briefly alleges in her amended complaint that Mr. Sikes created a hostile work environment when he told her "I don't give a damn about the PDIP." ECF No. 2 ¶ 21. Courts recognize retaliatory hostile work environment claims, *see Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 79 (D.D.C. 2013), but Ms. King has failed to sufficiently allege one.  To make out a hostile work environment claim, the plaintiff generally must allege retaliatory harassment that is "sufficiently severe or pervasive to alter the conditions of the victim's employment." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Ms. King fails to clear this bar because she relies on one stray remark.

(3) the unfavorable action gives rise to an inference of discrimination (that is, an inference that [her] employer took the action because of [her] membership in the protected class)." *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014).  To satisfy the third prong, the plaintiff can establish an inference of discrimination by alleging that she was "treated differently from similarly situated employees who are not part of the protected class." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005).  The Secretary argues that Ms. King's claim fails at the third step because she fails to allege that her curtailment was related to her race.  ECF No. 10, at 12-15.  Ms. King responds that she has pointed to a similarly situated comparator who was treated better than she was: Ms. Hazel.  ECF No. 12, at 8-9.  The court agrees with the Secretary.

To establish an inference of causation through a similarly situated comparator, the plaintiff must plead that "all of the relevant aspects of [her] employment situation were nearly identical to those of the other employee." *Breiterman v. U.S. Capitol Police*, 15 F. 4th 1166, 1174 (D.C. Cir. 2021) (alteration in original) (quoting *Burley v. Nat'l Passenger Rail Corp.*, 801 F. 3d 290, 301 (D.C. Cir. 2015)).  While the burden is "not onerous" at the motion-to-dismiss stage, the plaintiff must make more than a bald assertion that there is a similarly situated comparator.  *SS & T, LLC v. Am. Univ.*, No. 19-CV-721, 2020 WL 1170288, at *4 (D.D.C. Mar. 11, 2020) (quoting *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017)).  "A plaintiff's assertion that [she] is similarly situated to other[s] . . . is just a legal conclusion—and a legal conclusion is never enough." *Id.* at *5 (second alteration in original) (quoting *Bekkem v. Wilkie*, 915 F.3d 1258, 1275 (10th Cir. 2019)); *see Keith v. U.S. Gov't Accountability Off.*, No. 21-CV-2010, 2022 WL 3715776, at *3 (D.D.C. Aug. 29, 2022) (granting a motion to dismiss for failure to state a claim and reasoning that "to plausibly plead the causation element [through similarly situated comparators], [the plaintiff] must allege some facts to ground a reasonable inference that the

plaintiff was in fact similarly situated to comparator employees").  "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's job and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses."  *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1116 (D.C. Cir. 2016) (quoting *Burley*, 801 F.3d at 301).

Ms. King has failed to allege that she and Ms. Hazel were similarly situated.  To begin, they held different jobs: Ms. King was a Public Affairs Officer, Supervisory Section Chief, while Ms. Hazel was an Office Management Assistant.  ECF No. 2 ¶¶ 10, 43; *see Coleman v. Fed. Emergency Mgmt. Agency*, No. 20-CV-395, 2022 WL 4379039, at *16 (D.D.C. 2022) (finding that employees with dissimilar positions were not comparators).  Although Ms. King and Ms. Hazel shared a supervisor, Ms. Bunce, their job duties—managing as opposed to assisting—were fundamentally different.  ECF No. 2 ¶¶ 11, 12, 43.  That difference alone means that Ms. Hazel is not a similarly situated comparator.  *See Breiterman*, 15 F. 4th at 1174-75 (holding that "non-supervisory comparators are too dissimilar to draw any inference of discriminatory treatment").

But there is more.  Specifically, Ms. King and Ms. Hazel did not engage in similar misconduct.  *See Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (requiring the plaintiff to demonstrate that she and her comparator were charged with similarly serious offenses).  Ms. King was curtailed after she used foul language at a fashion show—a public event that she attended while holding a position in Public Affairs at the Embassy.  ECF No. 2 ¶¶ 9, 25.  Ms. Hazel used foul language toward an Embassy employee, not in a public venue and not while she was employed by the Embassy.  *Id*. ¶¶ 42-43.  Although Ms. King and Ms. Hazel both used foul language, the similarities end there.

In the absence of a similarly situated comparator, the court must dismiss Ms. King's race discrimination claim.

## IV.   Conclusion

For the foregoing reasons, the court will issue a contemporaneous order granting the Secretary's motion to dismiss, ECF No. 10, and dismissing the case.

/s/ Loren L. AliKhan
LOREN L. ALIKHAN
United States District Judge

Date: September 30, 2024

16